(No. 26313.—
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LOUIS DeROSA, Plaintiff in Error.

*Opinion filed Nov. 18, 1941—Rehearing denied January 15, 1942.*

WM. SCOTT STEWART, for plaintiff in error.

GEORGE F. BARRETT, Attorney General, and THOMAS J. COURTNEY, State's Attorney, (EDWARD E. WILSON, JOHN T. GALLAGHER, MELVIN S. REMBE, and SAMUEL L. FREEDMAN, of counsel,) for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

The defendant, Louis DeRosa, was indicted for the murder of Joseph Consentino, in the criminal court of Cook county. A jury found him guilty and fixed his punishment at imprisonment in the penitentiary for fourteen years.

Judgment was rendered on the verdict, and the defendant prosecutes this writ of error.

Seeking a reversal, defendant contends that prejudicial error was committed in refusing an instruction to the jury permitting a verdict of manslaughter. The sufficiency of the evidence to sustain the conviction is not challenged, and the evidence will be reviewed only to the extent necessary to determine the propriety of the court's ruling in declining to give an instruction on the question of manslaughter. April 9, 1940, the defendant, a precinct captain, was active at a polling-place, 416 North Halsted street, Chicago, in the primary held on the day named. Although it appears that the defendant and Consentino were not on friendly terms they, together with others, had a number of drinks after the polls were closed. About 1:40 A.M., April 10, the defendant, Consentino and Nick Varallo repaired to the Union Restaurant at 459 North Halsted street, directly opposite a tavern operated by the defendant. The three men described seated themselves on revolving stools at the counter. Consentino occupied the middle stool and Varallo and the defendant were seated at his right and left, respectively. A fourth patron at the counter, Rocco Martini, was seated beyond Varallo. Defendant and his two companions each ordered black coffee. Harold Pappas, a waiter, testified that he heard a conversation between Consentino and Varallo as they were talking across the defendant. After serving the three men, he turned his back and proceeded to open the pie case. Pappas then heard a shot, turned around and observed Consentino slumping forward on the counter and that the defendant, armed with a nickel-plated pistol, was standing beside him, to his left. As Pappas started to the kitchen, he heard a second shot. Jack Maris, one of the proprietors, was at the bar in the tavern adjoining the restaurant when the first shot was fired. He heard the second shot, ran to the restaurant and, upon his arrival, saw a body on the floor. Maris testified that he

saw defendant cross to the door with a gun in his hands and that Varallo was attempting to pull him out of the door. Varallo testified that while his coffee was before him there was no argument between defendant and Consentino, or scuffling on the floor; that his attention was first attracted by a shot but that he did not see it fired; that, after the second shot, he saw defendant standing in front of him, holding a shining object, resembling a gun. The witness testified further that he next remembered going to the door leading to Halsted street and running out without a coat, and that he did not know whether defendant took him by the hand. Varallo added he was afraid, did not dare to stop to look back, and, hence, did not notice what happened to Consentino after the successive shots were fired. When police officer Edward Mangan arrived at the restaurant, he saw Maris, Pappas and the deceased. He ran out in the street and saw a man on the west cross-walk of Halsted street, identified as the defendant. The officer succeeded in apprehending the defendant, searched him, found no weapon on him and brought him back to the restaurant. Mangan testified that Pappas, answering a question as to defendant's identity, said defendant was the man he had seen fire the gun. Officer John P. Lahey, who had arrived in the meanwhile, testified that Pappas, in the presence of the defendant, identified the latter as the man who had fired a shot and stated he had seen the defendant go across the street.

A statement taken from the defendant in the squad room of the State's attorney's office is to the effect that he was highly intoxicated when present in the restaurant, did not remember being there nor any of the circumstances incident to his presence; that he did not have a gun and did not remember firing shots at Consentino and, further, did not know where he was arrested.

A physician connected with the coroner's office testified that Consentino's death resulted from two multiple, through

and through bullet wounds of the face and neck. One bullet entered the left side of the neck and the other almost directly in the center of the back of the neck, one inch above the collar.

Defendant testified in his own behalf. He was then forty-seven years of age, five feet four inches tall, and weighed 135 pounds. Consentino was forty-two years old, five feet six inches in height, and weighed 175 pounds. Defendant's version of the homicide was that during the course of a conversation between Consentino and himself the former became angry and used insulting language towards him; that Consentino pulled a gun from his left side whereupon he, defendant, seized Consentino with both hands, turned the gun towards the latter and it went off; that, in the meantime, Consentino loosened his hold and he, defendant, obtained possession of the gun; that it appeared Consentino, although leaning over toward the counter, was reaching for another gun with his left hand and he, defendant, fired a second shot. Defendant testified that the first shot was accidental but that he fired the second shot about a second later to save himself. According to his testimony, he was within three inches of Consentino when the gun went off, and six or seven inches away when he fired the second shot. He testified further that Consentino fell off the stool onto the floor on his right side; that he walked over the deceased, saw he was still and, "so I didn't shoot any more." He then departed, and, as he stepped off the sidewalk, dropped the pistol, returned to his own tavern, had a drink with a patron, called for his two dogs and advised his bartender he was going for a walk.

Additional portions of defendant's testimony merit narration. He testified that when arrested, he told officer Mangan he had shot Consentino in self-defense; that Mangan advised him to say nothing about it and he, the officer, would straighten the matter out; that when taken to the

police station from the restaurant Mangan came to his cell and before taking him to the State's attorney's office suggested that he repeatedly say he was drunk, adding: "We will kill this case right here in the station." In rebuttal, Mangan denied the statements attributed to him and, in particular, denied having any conversation with defendant at the police station on the morning of April 10. Officer Thomas Carey testified that while defendant was in the squad room he inquired, "Louie, what made you do such a thing?" and that the defendant replied: "I don't know, I must have blew my nut."

Harry Jacysczyn, a taxicab driver, testified he was present when defendant shot the deceased; that prior thereto his attention had been directed to them when he heard Consentino using profane language and saw him pulling a revolver; that he departed immediately, and, just as he reached the street, heard a shot. Another witness, a fruit peddler, with a criminal record, testified that on April 9, 1940, in a conversation with himself Consentino made threats against defendant's life, saying: "I am going to get him in the head," and that when he saw the defendant he admonished him to be careful and stay away from Consentino.

Evidence was introduced to the effect that defendant enjoyed a good reputation as a peaceable and law-abiding citizen and, on the other hand, not only that Consentino's reputation in this respect was bad but that he had been convicted of robbery and carrying concealed weapons and twice arrested "on general principles."

Forty-four instructions were given to the jury, twenty-two on behalf of the People and the defendant, respectively. Instruction No. 22 on the form of verdict informed the jury that the defendant could be found guilty of murder and his punishment fixed at death, for the term of his natural life, or for a term of years not less than fourteen,

or that he could be found not guilty. The court refused to include in instruction No. 22 and in the forms of verdict delivered to the jury any instruction on, or form of verdict as to, manslaughter. Defendant offered instructions containing a form of verdict finding him guilty of manslaughter, another guilty of assault, and a third setting forth that if a reasonable doubt existed as to whether the homicide was murder or manslaughter, or as to whether defendant was justified or excused, he could only be convicted of the lesser offense, or acquitted. The instruction continued: "You have no right to compromise upon manslaughter if you have a reasonable doubt or disagree among yourselves as to the murder charge. A person should not be convicted of manslaughter unless proof of that crime has been made beyond all reasonable doubt and to a moral certainty." A fourth refused instruction recited that defendant could be found guilty of murder, manslaughter, or not guilty.

Where the evidence in a murder case would permit a jury to reduce the crime to manslaughter, an instruction on manslaughter should be submitted. (*People* v. *Pursley*, 302 Ill. 62; *People* v. *Bacon*, 293 id. 210.) Conversely, where the evidence clearly demonstrates that the killing was murder, an instruction authorizing manslaughter is erroneous. (*People* v. *Moore*, 368 Ill. 455; *People* v. *Payne*, 359 id. 246; *People* v. *Hauke*, 335 id. 217; *People* v. *Brown*, 326 id. 640; *People* v. *Grant*, 313 id. 69; *People* v. *Schultz*, 267 id. 147.) According to the testimony adduced by the People the defendant, Consentino and Varallo entered a restaurant together, sat down together, and, shortly thereafter, without provocation, defendant fired two shots into Consentino's head. Recourse to the evidence introduced by the defendant discloses that he interposed two conflicting defenses, first, misadventure, in that Consentino attempted to kill him, that he seized the gun and during the ensuing scuffle the gun went off with Consentino's

finger on the trigger. Secondly, defendant testified that after using profane language, Consentino drew a gun on him, threatened to take his life, and that he, the defendant, seized the gun and killed Consentino in order to preserve his own life. In the event of Consentino's death, resulting either from a misadventure such as an accidental firing of the gun or from defendant's exercise of his inalienable right of self-defense defendant could not have been guilty of manslaughter. There was no basis in the evidence on the part of either the People or the defendant for an instruction on manslaughter. Defendant was either innocent or guilty of murder, and the refusal to give an instruction on, and form of verdict for, manslaughter was correct. *People* v. *Hauke, supra; People* v. *Schultz, supra.*

Defendant also complains that instructions Nos. 8, 11, 12 and 14 should not have been given. Here, as in *People* v. *Jersky,* 377 Ill. 261, defendant's difficulties and complaints with respect to instructions are largely of his own creation. In the *Jersky case* we said: "The defense which he offered was multifarious and confusing and was probably so intended. He had a right, of course, to present as many defenses as he had or thought he had, and this is true if he offered conflicting defenses for the express purpose of confusing the jury. However, when this is attempted he places himself in a very poor position to complain of the court's rulings on the giving and refusing of instructions." Instruction No. 8 is not subject to the criticism that it ignored the question of self-defense. It must be considered with reference to numerous other instructions given by the court on the issue of self-defense. A particular instruction need not contain all the law either of the case or upon a given subject. It is sufficient if the series of instructions, considered as a whole, fully and fairly announces the law applicable to the theories of the People and of the defendant, respectively. *People* v. *Hicketts,* 324 Ill. 170.

Instruction No. 11 does not assume, as defendant asserts, that the killing of Consentino was the act of the defendant. The evidence previously recounted shows, however, that the defendant did admit shooting Consentino. Instruction No. 12 merely defines the expression "malice aforethought," and does not purport to place any burden upon defendant, as he contends, to prove beyond a reasonable doubt that no circumstances existed excusing or justifying the homicide. Instruction No. 14 refers to the testimony tending to show that Consentino was a violent, quarrelsome and dangerous man. Approving an identical instruction, the Supreme Court of California observed (*People* v. *Young,* 63 Pac. 837) : "There is no valid objection to the instruction given. The words 'This was not admitted as tending in any way to justify his slaying by the defendant,' when read with and qualified by the rest of the instruction are not improper; and the instruction thus read, correctly enunciates a principle of the law of evidence applicable to the case at hand." There, as here, the question of the reputation of the deceased was involved. The challenged instruction was properly given.

We are constrained to add that the giving of innumerable instructions places an unnecessary burden on the trial court. When both sides,—the People and the defendant,—offer so many instructions only confusion can result. The trial court cannot and should not be expected to use the requisite degree of care and caution in considering an abnormally large number of involved instructions within the short-time limitation available.

The instructions assailed being free from reversible error, the judgment of the criminal court is affirmed.

*Judgment affirmed.*