People of the State of Illinois, Defendant in Error, v. Larry Wheeler, Plaintiff in Error.

Gen. No. 49,493.

First District, First Division.
April 12, 1965.
Rehearing denied May 10, 1965.

Jay M. Smyser, of Chicago, for plaintiff in error.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Joseph v. Roddy, Assistant State's Attorneys, of counsel), for defendant in error.

MR. PRESIDING JUSTICE BURMAN delivered the opinion of the court.

This is an appeal from the conviction of Larry Wheeler for the murder of James Boleyn. The defendant was tried before a jury which found him guilty as charged in the indictment and fixed his sentence at imprisonment in the Illinois State Penitentiary for a term of twenty-five years. The trial court denied the defendant's post-trial motions and pronounced sentence. The Illinois Supreme Court issued its writ of error, appointed counsel to represent the indigent defendant in connection with the writ and subsequently transferred the appeal to this court.

The defendant presents the following charges of error: (1) that the evidence was insufficient to establish his guilt beyond a reasonable doubt; (2) that the court improperly excluded certain testimony concerning the decedent's reputation for violence; (3) that the court improperly gave certain of the State's instructions and improperly refused to give the defendant's instruction on involuntary manslaughter. The defendant asks this court, on the basis of these errors, to reverse the conviction and discharge the defendant or to find the defendant guilty of manslaughter and order him to be discharged because he has already served a sufficient penalty for that crime, or to grant a new trial to determine the question of the defendant's guilt or innocence of manslaughter.

Because the evidence is largely conflicting, we summarize the pertinent testimony of each of the principal witnesses. The State's chief witness, John Whitsett, testified that on the evening of November 1, 1959, when the events in question took place, he and the decedent were tending bar at Bill McGee's Tavern, located at 1764 North Larabee in Chicago. The defendant and his girl friend came into the tavern at about 8:30 or 9:00 p. m. and the decedent and Whitsett served them drinks until shortly before midnight, when the defendant's girl friend knocked an empty bottle

off the bar. As he picked up the bottle, Whitsett observed the decedent slapping the defendant with his hands. After several customers separated the decedent and defendant, the defendant and his girl friend left the tavern on the decedent's orders. In Whitsett's opinion, the defendant was not intoxicated at that time.

About two hours later, the defendant and his girl friend returned to the tavern. As the defendant walked toward the back of the bar, the decedent came out from behind the bar toward the defendant carrying an eighteen-inch piece of insulated electrical cable which was ordinarily kept behind the bar. As the decedent approached him, the defendant said, "Don't hit me. I didn't come back to cause any trouble. I just came back to talk to you." Though Whitsett did not hear what else was said, he saw the decedent and defendant talk for a while and then shake hands. Then the defendant and his girl friend sat at the bar and the decedent ordered Whitsett to serve them, which he did. After a few minutes, however, Whitsett saw the decedent hitting the defendant on the side of the head with his fist. There was a scuffle and the decedent took the defendant by the neck and the seat of his pants, pushed him to the door and threw him out. Then the decedent ordered the defendant's girl friend to leave. Whitsett said that at the time of the scuffle, the decedent had nothing in his hands. He testified further that as the decedent was returning to the bar he (Whitsett) heard a voice outside the tavern; he could not hear what was said. The decedent then ran out the door and Whitsett heard four or five shots immediately thereafter. When Whitsett went outside he found the decedent lying on the sidewalk just outside the door and he saw a man, who he believed to be the defendant, running away carrying a gun. Whitsett said that he accompanied a police officer, Roland Har-

455

vey, in search of the defendant whom he had known for seventeen months. They went to Tennessee Buck's Tavern, where only the officer went inside; after the officer came out again, the bartender came out and gave the officer a gun. Some time later, Whitsett saw the defendant and observed that there was blood running down his head and that there were blood stains on his shirt.

Martin Curran, who was called by the State, testified that he went to Bill McGee's tavern at about 11:00 or 11:30 on the night in question. He said that the decedent "booted" the defendant out of the tavern with his foot and told him to stay out and not come back. Curran said he was standing at the bar at the time and after this incident he turned back to the bar to order a drink when he heard shots. He looked out the tavern window and saw a man with a gun. He went out the tavern door, saw the decedent lying on the ground two or three feet from the door; Curran saw nothing in the decedent's hand. Curran said that he saw a man running away and that he unsuccessfully chased him.

On recross-examination, Curran further testified that his visit to the tavern on the night in question was the third occasion on which he had been in the tavern. When he was asked if he had ever seen the decedent put a man out of the tavern like he did on the night in question, the State objected on the ground that the defendant could only ask about the decedent's reputation; the court sustained the objection and the defendant withdrew the question. Curran was then asked if the decedent was in the habit of putting people out of the tavern; the State objected and the court sustained the objection. The questioning proceeded as follows:

456

Q. Do you know people in the community generally where this tavern is located?

. . .

A. Not offhand, sir.

Q. Are you acquainted at all with other people who frequent this tavern you went into?

A. Just maybe a couple of my friends that I have went in with a couple of times or just by myself.

Q. Based on this acquaintanceship, do you know the deceased's reputation as to his peacefulness—

At this point the State objected on the ground that the foundation for the witness' testimony as to the decedent's reputation was insufficient. The court sustained the objection and the defendant withdrew the question.

Police Officer Harvey, who was also called by the State, said that he arrived at the tavern about 2:30 in the morning. He found the decedent lying on the sidewalk. After speaking to the other bartender, Whitsett, they left the scene to search for the defendant. They first went to an apartment building where Whitsett said the defendant was living, but since the building was large and they did not know which apartment was the defendant's, they next proceeded to Tennessee Buck's Tavern where they had a conversation with the bartender, Gordon Williams. In the company of Whitsett and Williams, the officer went back to the defendant's apartment building where he saw a man walking out of the building. The officer called out "Larry" and when the man, whom he identified as the defendant, answered "yes," he put him under arrest. The officer further testified that he had obtained a gun at Tennessee Buck's Tavern and when he asked the defendant "if this was the gun he had left at Tennessee Buck's"

457

the defendant admitted that it was. The officer testified: "I then asked him why did he shoot James Boleyn. He says 'I don't know why I did.'" Officer Harvey said that the gun smelled of smoke and that it contained six empty cartridges which he removed from the gun. Although, on cross-examination, he said that he ascertained that the defendant had been drinking, in his opinion, the defendant was not intoxicated.

Another police officer, Charles Knapp, was called by the State. He testified that when the defendant was brought into the police station, he noticed a slight laceration on his head and several drops of blood on his shirt. Upon searching the person of the defendant, the officer found a sales slip showing that the defendant had purchased a gun on August 25, 1959, for $25.88. A comparison of the serial numbers on the slip and on the gun revealed that they were identical.

Joseph Edward Campbell, the physician who performed the autopsy on the body of the decedent, testified that the decedent's body had four bullet wounds and that in his opinion internal bleeding resulting from the bullet wounds caused the decedent's death. The doctor also testified that an analysis of the decedent's blood revealed that at the time of death the decedent was intoxicated.

The defendant took the stand as the only witness for his defense. He stated that he and his girl friend went to McGee's Tavern about six o'clock on the evening in question. He said that he was drinking beer and that he had no more than a couple of shots of whiskey. About midnight he heard something fall, but did not know what it was at the time. He testified that the decedent Boleyn, whom he had seen before in the neighborhood, came around the bar with what the defendant called a "blackjack" and beat him with it. Then the defendant and his girl friend left the tavern

and went to another bar where they had only one drink because the defendant was short of money.

The defendant testified further that he returned to McGee's Tavern about two o'clock in the morning. He brought from home a gun on which he intended to borrow money from the owner of the tavern whom he had known for two years. He also intended to apologize to the decedent because he did not want any trouble. He said that he wanted to apologize because the decedent "was noted in the neighborhood, all the time beating up on people, and I was scared of him." The defendant testified that when he returned to McGee's Tavern, the decedent "came around the bar with this blackjack and I told him, I says, I put my hands up like that, I did not want him beating me there, and I told him I just wanted to make friends with him and didn't want no trouble. And he shook hands with me there and he said it was his fault and he thought I had throwed the bottle." The defendant said that he then ordered a drink and that when he asked the decedent whether the owner, McGee, was still there, the decedent jumped up, started swearing at the defendant and beat him over the head with the "blackjack," which the defendant described as a cable wrapped in tape. He said that when the decedent beat him out of the tavern door, "I was just lightheaded from the beating, and I was nervous and, well, I just turned around and started shooting. I couldn't see what I was shooting at, I was nervous." He said that he was scared then and ran.

On cross-examination, the defendant testified that he had borrowed money from McGee on several previous occasions and that he had put the bill of sale for the gun in his pocket because he was going to sell it to McGee. The defendant admitted that the gun, which was received in evidence, was his and that when he

picked up the gun at home he knew that it was loaded with six bullets.

In seeking reversal of his conviction, the defendant argues that the State did not produce sufficient evidence to establish beyond a reasonable doubt that the defendant was guilty of murder as charged in the indictment. Specifically the defendant argues that proof is lacking on the essential element of malice aforethought and that, in fact, the evidence proves that the defendant acted in self-defense. Furthermore, the defendant argues that there are also serious questions about the sufficiency of the evidence identifying the defendant as the person who shot the decedent and identifying the defendant's gun as the murder weapon.

When all the evidence in the case is considered we are satisfied, as were the jury and judge who saw and heard the witnesses, that the evidence did prove that the defendant was guilty as charged beyond a reasonable doubt. The evidence shows that the defendant left McGee's Tavern after an altercation with the decedent; that the defendant went home and there obtained a gun which he knew was loaded; that some two hours after the first altercation, the defendant returned to the tavern carrying the loaded gun; that upon his return the defendant was beaten by the decedent who forced the defendant out of the tavern; that the decedent returned to the tavern to order the defendant's girl friend to leave; that the decedent, upon hearing a voice outside the tavern, ran out the front door and was immediately shot four times just outside the tavern door. The defendant admitted firing a gun outside the tavern and then fleeing. Whitsett identified the defendant as the man who was fleeing the scene. The uncontradicted evidence further shows that shortly after the shooting the police received a gun which the defendant admitted was his and that six bullets had been fired recently from the

460

gun. The jury could reasonably have disbelieved the defendant's story that the decedent continued to beat him with a "blackjack" outside the tavern. Indeed the evidence showed that immediately before the shooting, the decedent had returned to the tavern to order the defendant's girl friend to leave. The evidence of two witnesses indicates that during the time just before the shooting, the decedent was not carrying the so-called "blackjack." No "blackjack" was found in the vicinity of the decedent's body and Whitsett testified that on the morning following the shooting, he found the tape-wrapped cable in its usual place inside the bar. Furthermore, the jury could reasonably have disbelieved the defendant's story that he brought the gun back to the tavern in order to obtain a loan on it from McGee. The defendant admitted that McGee had loaned him money before and there was nothing to indicate that some collateral, such as a gun, was required to obtain the money on those previous occasions.

■ Hence the jury might reasonably conclude beyond a reasonable doubt that the defendant waited for the decedent to come outside the tavern and then shot him out of malice and not in self-defense. The cases cited by the defendant do not require a different result. The case which is primarily relied on by the defendant, People v. Motuzas, 352 Ill 340, 185 NE 614, is not controlling. There the court concluded that the decedent and another person, acting according to a previously determined program between them, assaulted the defendant; that the decedent was carrying a weapon at the time; and that these circumstances induced in the defendant a reasonable and well founded belief that he was actually in danger of losing his life or of receiving great bodily harm. As we have already indicated the jury in the present case was justified in making findings directly opposite to those

461

which the court in Motuzas found to be reasonable. The other cases cited by the defendant are also inapplicable here.

█ The defendant next contends that the court erred in excluding evidence of the decedent's reputation for violence, which evidence would tend to prove the defendant's fear of the decedent thereby supporting his justification of self-defense. As indicated above, the defendant's counsel sought to elicit from Martin Curran, a customer who was in McGee's Tavern on the night in question, evidence concerning the decedent's reputation for peacefulness. Since Curran testified that he was not acquainted with the people in the community generally and had been in the tavern only "a couple of times," the court, on the proper objection by the State, excluded the testimony because of the lack of a sufficient foundation. We believe that the court committed no error in so ruling.

█ Evidence of the decedent's violent disposition and of his prior threats or misconduct is admissible in a murder case where the defendant relies on self-defense and the preliminary testimony establishes an act of aggression by the decedent. People v. Adams, 25 Ill2d 568, 185 NE2d 676. However such testimony should not be heard unless the witness had an adequate knowledge of the decedent and those in the community who are acquainted with him. As the Supreme Court said in People v. Moretti, 6 Ill2d 494, 129 NE2d 709:

> This court, on numerous occasions, has held that reputation witnesses must be shown to have adequate knowledge of the person queried about and that evidence of reputation, to be admissible, must be based upon contact with the subject's neighbors and associates rather than upon the personal opinion of the witness. (Citing cases.) (6 Ill2d at 523, 524)

We believe that the court properly excluded Curran's testimony concerning the decedent's reputation for peacefulness because Curran's own testimony showed that he did not have sufficient knowledge of the decedent and his neighbors and associates on which to base his testimony concerning the decedent's reputation for peacefulness.

■■ The defendant next contends that the court erred in giving an instruction on intoxication which stated "that drunkenness shall not be an excuse for any crime or misdemeanor, unless such drunkenness, be occasioned by the fraud, connivance, or force of some other person. . . ." The defendant argues that this instruction is inapplicable since there was no contention that anyone had contributed to the defendant's intoxication. We find no error, however, in giving this instruction which pertains to the State's theory of the case. The defendant principally contends that by giving only this instruction, the jury was improperly led to believe that this instruction covered the entire subject of the effect of the defendant's intoxication. The defendant argues that the court erred in not giving an additional instruction that the defendant's drunkenness rendered him incapable of forming the intent necessary to prove murder. We cannot agree. The record does not show that the defendant offered such an instruction and he does not contend here that he did so. Under these circumstances, the trial court was under no duty to give the instruction on its own motion and the defendant's objection was thereby waived. People v. Carvin, 20 Ill2d 32, 169 NE2d 260.

■■ The defendant also contends that the court erred in giving an instruction which informed the jury in essence that, even though they believed that the decedent made the first attack on the defendant, he was not acting in self-defense, if at the time of the

killing he was not in fear for his life or bodily safety. However, since this objection was not raised in the defendant's post trial motion, it is deemed to be waived. A party is limited to the errors alleged in the written motion and all other errors are waived. People v. Hunter, 23 Ill2d 177, 177 NE2d 138.

■ Finally the defendant contends that it was error to refuse his tendered instruction on voluntary manslaughter. Voluntary manslaughter was defined by the statute, which was applicable at the time of this occurrence, as follows:

> In cases of voluntary manslaughter, there must be a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing. The killing must be the result of that sudden, violent impulse of passion supposed to be irresistible; for if there should appear to have been an interval between the assault or provocation given, and the killing, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge, and punished as murder. (Ill Rev Stats 1959, c 38, § 362.)

It is well established that where evidence in a murder prosecution would permit the jury to find the defendant guilty of manslaughter rather than murder, it is reversible error to refuse to give an instruction on manslaughter. People v. Canada, 26 Ill2d 491, 187 NE2d 243. On the other hand, if there is no evidence upon which a verdict of manslaughter reasonably can be based, such an instruction should not be given. People v. Burnett, 27 Ill2d 510, 190 NE2d 338; People v. Dukes, 19 Ill2d 532, 169 NE2d 84.

■ The defendant argues that the Canada case is on all fours with the case at bar. We believe, however, that in that case, unlike the present case, there was evidence which would permit the jury reasonably to find the defendant guilty of voluntary manslaughter. Here the evidence is clear that the decedent was not beating the defendant nor carrying a weapon at the time he was shot, but rather that he threw the defendant out of the tavern, returned to the tavern to order the defendant's girl friend to leave and only then was shot as he was going out of the tavern again. On such evidence, the jury could not reasonably have found the necessary elements of voluntary manslaughter as provided by statute. Moreover, it is apparent from the sentence they meted out that the jury took into consideration the previous encounter between the decedent and the defendant.

Since the evidence establishes the defendant's guilt beyond all reasonable doubt and since we believe there were no errors in the trial, the judgment should be affirmed.

Judgment affirmed.

MURPHY and KLUCZYNSKI, JJ., concur.