THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JUAN RIVERA VEGA, Defendant-Appellant.

(No. 57526;

First District (4th Division)—December 5, 1973.

*Rehearing denied January 9, 1974.*

James A. Stamos, of Serpico, Stamos, Dvorak, Navigato and Hett, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Dennis J. O'Hara, Assistant State's Attorneys, and Joel B. Perzov and Larry L. Thompson, Senior Law Students, of counsel), for the People.

Mr. JUSTICE DIERINGER delivered the opinion of the court:

Juan Rivera Vega was convicted of involuntary manslaughter after a jury trial in the Circuit Court of Cook County and was sentenced to a term of three to nine years in the penitentiary. The issues on appeal are whether the defendant was denial a fair trial because of the conduct of the prosecuting attorney; whether the jury's verdict of guilty of involuntary manslaughter was supported by the evidence; and whether the defendant's sentence was excessive.

On the evening of September 10, 1970, the deceased, Ruben Rodriguez Torres, and his brother, Anibal, went to the defendant's second floor apartment at 1942 South Carpenter in the City of Chicago to play dominoes. Miguel Cabrera, who lived in the first floor apartment at the same address, was also present.

Anibal Torres testified an argument broke out about 1:00 A.M. The defendant accused the brothers of cheating, and they started to leave. The defendant blocked their way and called Ruben "chicken," but they pushed their way past Vega and continued down the stairs. Vega followed them out and said he would kill Ruben and then say he had done it in his own house. When they got to the street, the defendant came behind them with a gun and fired the first shot while their backs were turned. The deceased approached the defendant and tried to take

the gun away. It was then he was fatally wounded in the abdomen. Anibal Torres then kicked Vega in the wrist, got the gun, and ran to get his father. When he returned, the body of his brother had been removed from the street. Neither brother had a weapon.

The defendant testified that while playing dominoes at about 12:30 A.M., his wife got up and asked everyone to leave because they were making too much noise. Miguel Cabrera left at that time, but the Torres brothers stayed. The defendant said he went to the washroom and upon returning to the room he was hit by Ruben Torres. The brothers said "bad words" to him and told him they would kill him. It was then he got his gun from a cabinet near the front door. The brothers grabbed him and tried to drag him out the door and down the stairs. He was afraid for his life, but did not intend to use the gun and did not attempt to point it at anybody. The gun went off on the stairs when he was kicked in the wrist by Anibal. After the one shot was fired, Ruben stayed on top of him and Anibal took the gun. He went upstairs to his apartment and waited for the police.

The defendant's wife testified that after telling everyone to leave, she came out of her room a second time when the fighting broke out and went to the third floor to ask for assistance because there was no telephone in her apartment, but no one answered her knock. She also testified that when the shot rang out she thought her husband had been killed and did not know he had not been shot until a police officer told her.

Both the defendant's sons, aged 20 and 23, testified they were sleeping at the time of the altercation. One lived in the same apartment with his parents, and the other lived in another apartment in the same building.

Frances Jimenez, who lived at 1936 South Carpenter Street, testified she heard the defendant's voice between 1:00 and 1:30 A.M., saying, "I could shoot you and say it was in my house." She heard three shots, and when she looked out the window she saw Anibal standing in the street saying, "I have the gun," and she saw the defendant getting up from the street. Anibal walked backwards from the defendant and then ran from the scene. Then she saw two men she could not identify pick up the body and drag it closer to the home of the defendant at his direction.

Miguel Cabrera testified he played dominoes with the defendant and the Torres brothers on the night of September 10, 1970, but left at about 10:00 P.M.

■■■ The defendant first complains he was prejudiced by the prosecution's reference to the Torres brothers as "boys," by referring to the deceased as a "victim," and by the questioning of the deceased's widow about her children. Upon reviewing the record we conclude these were

not material factors in the trial. There was just one mention of the word "victim," and it was objected to, the objection was sustained and never mentioned again. The reference to the brothers as "boys" is understandable in the context that the defendant is 47, while the Torres brothers were 22 and 21 years of age. They had achieved majority but were young in comparison with the defendant.

The mention of the deceased's family occurred in the following manner:

"Q. Would you state your name, please?

A. Isabelle Rodriguez.

Q. Where do you live?

A. 1112 West Cullerton.

\* \* \*

Q. With whom do you reside at that location?

A. With my two children.

Q. Tell us the ages of your two children.

MR. STAMOS: Objection, your Honor. It is irrelevant.

THE COURT: The objection is overruled. You may answer."

■■ Shortly thereafter, a sidebar conference was held and defense counsel made a motion for a mistrial and to strike the testimony from the record. The motion for a mistrial was denied but the court instructed the jury to disregard the testimony. The defendant cites the case of *People v. Dukes* (1957), 12 Ill.2d 334, for the proposition that evidence the deceased left a spouse and family is strongly condemned. However, not every mention of the deceased's family is reversible error. In *People v. Jordan* (1967), 38 Ill.2d 83, 91, the court stated:

"Generally, the rule is that '\* \* \* where testimony in a murder case respecting the fact the deceased left a spouse and family is not elicited incidentally, but is presented in such a manner as to cause the jury to believe it is material, its admission is highly prejudicial and constitutes reversible error unless an objection thereto is sustained and the jury instructed to disregard such evidence.'

\* \* \*

"However, every mention of a deceased's family does not *ipso facto* entitle the defendant to a new trial, since in certain instances, dependent upon the facts, such a statement can be harmless. *People v. Golson*, 32 Ill.2d 398; *People v. Brown*, 30 Ill.2d 297."

In this case we believe the reference to the decedent's family was made incidentally and was not prejudicial.

■■ Next, the defendant complains he was prejudiced by the introduc-

tion into evidence of a photograph of the deceased taken at the morgue. The admission of photographs of the decedent is discretionary with the trial judge. (*People v. Myers* (1966), 35 Ill.2d 311; *People v. Hoffman* (1965), 32 Ill.2d 96.) In this case the photograph was only of the head of the deceased, and it was properly admitted without an objection by defense counsel for the purpose of identifying the deceased. It was not the type of photograph which is inflammatory such as to arouse the prejudicial emotions of the jury. *People v. Hobbs* (1966), 35 Ill.2d 263.

The defendant also maintains he was prejudiced by the introduction into evidence of the four spent cartridges and one live cartridge because the prosecution, in response to a discovery motion, had not listed those items as part of the physical evidence. It is argued that prior to the introduction of that exhibit, the defendant never had knowledge that more than one shot had been fired, and no objection was made to the introduction of the exhibit because to do so would have undermined the defendant's credibility prior to his testifying, citing *People v. Lowe* (1967), 84 Ill.App.2d 435.

■■ There could have been no prejudice to the defendant in this case because Mrs. Jiminez had testified she heard more than one shot, and the officer testified he had taken five shells from the gun taken from Anibal, one live and four expended. In addition, the prosecutor stated in his closing argument that the exhibit had no probative value. Thus, the exhibit could have had no impact on the jury's deliberations. See, *People v. Cunningham* (1970), 123 Ill.App.2d 190.

After reviewing the record we do not believe these alleged errors, either separately or taken together, deprived the defendant of a fair trial.

The defendant contends it was error to submit an instruction to the jury on involuntary manslaughter because there was no evidence he acted with a conscious disregard of a substantial risk or that he acted in a reckless manner.

The general rule for submitting instructions on involuntary manslaughter to the jury is stated in *People v. Taylor* (1967), 36 Ill.2d 483, 488:

> "* * * 'if there is any evidence in the record which, if believed by the jury, would reduce a charge of murder to manslaughter, an instruction defining that crime should be given.' * * * it is immaterial that the defendant did not request a manslaughter instruction, or objected to it.
>
> * * *

It is only where the evidence establishes that the defendant is guilty of murder or is not guilty, as for example in cases in which

the defense is alibi, or mistaken identity, that a defendant may be said to have a right not to have the jury charged as to the lesser included offenses."

██ The record shows there is ample evidence for the jury to find the defendant was guilty of reckless conduct in obtaining a loaded gun in a situation where there was no realistic threat to his life. The defendant weighed over 220 pounds, much more than either of the brothers, and he never called for help from his sons or anyone else. The jury could also have found from the testimony of Anibal Torres and Mrs. Jiminez that the defendant did not obtain the gun to use in self-defense, but rather to inflict injury or scare the brothers. Whether or not the defendant intended to kill Ruben Torres is irrelevant, because involuntary manslaughter is an offense in which death results from acts performed recklessly even though there was no intent to inflict injury. Ill. Rev. Stat. 1971, ch. 38, §§ 4—6, 9—3(a).

██ Finally, the defendant contends his sentence of three to nine years should be reduced or probation granted. In the recent case of *People ex rel. Ward v. Moran* (1973), 54 Ill.2d 552, the Supreme Court held an appellate court does not have the right under Supreme Court Rule 615 to reduce a prison sentence to probation. The sentence imposed was within the statutory limits (Ill. Rev. Stat., 1972 Supp., ch. 38, § 9—3(c)), and we hold it does not constitute a great departure from the spirit and purpose of the fundamental law or that it violates Section 11 of Article I of the Constitution of Illinois, which requires all punishment to be proportional to the offense. In *People v. Logan* (1971), 132 Ill.App.2d 934, cited by the defendant, the appellate court reduced a prison term for involuntary manslaughter to three to ten years, a term similar to what the defendant received from the trial court.

For these reasons, the judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

BURMAN, P. J., and JOHNSON, J., concur.