THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* NELSON W. BOISVERT, Defendant-Appellant.

(No. 73-178;

Second District—April 3, 1975.

36.

Dom J. Rizzi and Jack R. Pine, both of Chicago, for appellant.

John H. Maville, State's Attorney, of Belvidere, (James W. Jerz, of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

Nelson W. Boisvert, the defendant, appeals from his conviction of murder after a jury trial and from the imposed sentence of 20-35 years in the penitentiary. Defendant contends that the State's failure to prove his sanity and guilt beyond a reasonable doubt requires reversal, and that the court's refusal to give a tendered instruction defining involuntary manslaughter was error which requires a new trial.

On July 22, 1972, about 10 P.M., defendant and several of his friends went to the Boone Lake Camp grounds with various camping gear to get the camp site ready, while their wives apparently prepared the food at home. Another tent was pitched at their accustomed place, and defendant and his friends selected a different site close by. While his friends unloaded the cars and began to pitch the tent, defendant, who seemed tired, set up a cot and began taking a nap. Shortly thereafter, a group of campers which included the deceased, Terry Stiles, returned to their campsite from the swimming area. They were joking, laughing and making noise. This apparently disturbed or awakened the defendant who was sleeping on a cot some 20 or 30 feet away from the camp site of the Stiles' group. An argument regarding the noise ensued, after which defendant returned to his campsite.

Some minutes later defendant went again to where the Stiles' group was camping and apologized. He shook hands with Terry Stiles and another of the men and they engaged in a brief and casual conversation.

During the conversation defendant uttered a profanity and Stiles asked him to apologize, which defendant did. The conversation continued for a short time and Boisvert returned to his campsite.

About 15 or 20 minutes later the defendant and one of his friends left for their homes to pick up the others. There was testimony that during the trip defendant seemed somewhat unhappy about the noise at the campsite. After arriving home the defendant was informed that his young daughter was still at a friend's house and had not yet come home. He became upset about this fact. He and his friend then loaded the car with additional camping material from his home, including defendant's shotgun.

The shotgun, when in the house, was always kept loaded for protection with double "O" buckshot in the top barrel and a number 2 magnum in the bottom barrel. It was defendant's usual practice to take his shotgun to Boone Lake, and most other campers would also carry guns. The Lake's facilities included a trap range and a rifle range.

After the defendant and his friend returned to the Boone Lake campsite, someone in the Stiles' group made a comment regarding the Boisvert tent. The defendant asked if they were knocking his tent, to which Terry Stiles responded, "No, if I was, it would be over by now". When one member of the Stiles' group started walking to the rear of a nearby car, the defendant began walking toward his own car. When he got to his car he reached in the open door, pulled out his gun case and told the members of the Stiles' group not to go for a gun. He asked for Stiles saying, "I want to talk to you. I want to talk to the guy who made me apologize. I want to talk to the loud mouth." There was testimony that he repeated this two or three times after which one of the Stiles' group said that if he wanted to talk to Terry he would have to talk to all of them.

Defendant removed his shotgun from the gun case, and repeated that he wanted to speak to the guy who made him apologize. He said that he had a gun and that no one should try to get one. He then stated, "I have the safety off," and asked if they wanted a demonstration. He said, "I can get you all in one shot if I want to. I don't even have to aim. All I need to do is pull the trigger."

One of the Stiles' group tried to calm defendant by showing him that they had no guns and wanted no trouble. The defendant insisted that he did not want to talk to him but to the "loud mouth who made him apologize." At one point defendant instructed everyone to move away from Stiles.

It appears from the testimony that while defendant spoke to the Stiles' group he was holding the shotgun in his shoulder with one hand and

with his finger on the trigger. There was a conflict, however, as to whether the gun was being pointed at anyone or was being waved around somewhat. This exchange lasted from 5 to 10 minutes. Finally, the defendant relaxed his weapon and began to turn away. There was a very slight pause. The defendant said, "I am going to jail anyway * * * I don't like you anyway," and he turned back, brought the gun up and it went off. All this happened almost simultaneously. Terry Stiles was struck and killed, and the defendant fled.

There was testimony that the shotgun had a "hair trigger" and would go off with little pressure.

The State introduced a statement given to the Winnebago County Sheriff's police on July 23, 1972, by defendant. In the statement defendant told of his complaints of the noise at the camp site and then said:

> "And when we were arguing and this one guy went walking back to the back of a car and I was walking toward my car because I thought the guy was going to get a gun. I got back to my car and got my gun and told the other group of people not to go for any gun, the safety wasn't on, and as I turned and pointed the gun, it went off. The gun has a 'hair' trigger * * * When the gun went off the man I hit wasn't even the man I was mad at."

Defendant, however, testified in his own behalf at the trial that he did not remember an argument at the camp site nor a subsequent apology for swearing. He did not recall that he helped pull up the tent or that he had any other arguments about the tent. When asked about the shooting he said he remembered that there was an argument. "I pulled my gun out of the gun case and I remember saying not for them to go for a gun, and I pulled it out and turned around and it went off." He did not recall holding the gun but he did recall turning around and the gun going off and described it as happening in one motion.

On the sanity issue, the State introduced the testimony of members of the Stiles' group, two police officers and an expert witness while two expert witnesses and several lay witnesses testified for the defendant.

From our review of the record, we first conclude that the defendant was proved to be sane beyond a reasonable doubt.

The testimony of the eye witnesses offered by the State was to the effect that they did not observe anything unusual about defendant during the confrontations. The experienced police officers said that the defendant appeared somewhat nervous and confused and appeared to have been drinking when taken into custody, but that he was not insane within the legal definition. The lay witnesses on behalf of defendant testified to previous incidents in which defendant lost his temper and

threatened violence when intoxicated. His mother's testimony established that defendant had a broken family background, would lose his temper "over everything" when young and that he had been treated by a psychiatrist as a child. In addition, he had been sent by authorities, to a boys' school from which he frequently ran away. As an adult, he would often lose his temper and engage in violent and abnormal conduct when drinking.

The experts who testified for the defense said that defendant had an I.Q. of 86, characterized as the dull-normal range. One expert testified that he was an emotionally immature, passive-dependent individual with poor impulse control, poor ability to test reality and less ability to cope with stresses than a normal person and that there was vulnerability to decompensation accentuated by alcohol. The other defense expert characterized defendant as suffering from a temporary ego rupture. Both experts in answer to hypothetical questions gave their opinion that defendant was insane under the legal definition. On very much the same factual background the State's expert came to the conclusion that defendant was legally sane.

■■ Based on the conflicting evidence the trier of the facts could properly determine that defendant was legally sane beyond a reasonable doubt. See *People v. Newbury* (1972), 53 Ill.2d 228, 236; *People v. Ford* (1968), 39 Ill.2d 318, 321-322; *People v. Harrington* (1974), 22 Ill.App.3d 938, 944-5; *People v. Arnold* (1974), 17 Ill.App.3d 1043, 1049.

We next consider the contention that the court committed reversible error by refusing an instruction tendered by defendant defining involuntary manslaughter.

■■■ We conclude, as a preliminary matter, that the evidence fully supports the jury's finding of murder. It is not necessary to show that an accused has formed an intention to kill in order to justify a murder conviction. It is sufficient to show that a defendant voluntarily and wilfully committed an act, the natural tendency of which was to destroy another's life, with the intention being implied from the character of the act. (See *People v. Latimer* (1966), 35 Ill.2d 178, 182; *People v. Cannon* (1971), 49 Ill.2d 162, 166; *People v. Gonzales* (1968), 40 Ill.2d 233, 241; *People v. Mitchell* (1973), 12 Ill.App.3d 960, 965.) In this case an intention to commit murder could well have been implied from the defendant's conduct.

The question remains, however, whether there is evidence which would justify the giving of an instruction as to the lesser included offense of involuntary manslaughter.

■■ The rule is well established that if there is some evidence in

the record which, if believed by a jury, would reduce the crime to involuntary manslaughter, defendant has a right to an instruction defining the lesser included offense. (*People v. Joyner* (1972), 50 Ill.2d 302, 306; *People v. Taylor* (1967), 36 Ill.2d 483, 489; *People v. Latimer* (1966), 35 Ill.2d 178, 182.) A defendant is entitled to the benefit of any defense shown by the entire evidence; and the court does not weigh the evidence in making the determination. (*People v. Khamis* (1951), 411 Ill. 46, 53.) Thus, even if the evidence is conflicting, and even if the defendant's testimony is impeached, a defendant may be entitled to the instruction. See *People v. Boothe* (1972), 7 Ill.App.3d 401, 403.

In this appeal, defendant argues that "there was abundant evidence introduced at the trial from which the jury might legitimately have found that the gun discharged accidentally." We do not assume that defendant is arguing that the shooting was purely an accident; for if the gun were accidentally fired he could not be guilty of involuntary manslaughter. (See *People v. Johnson* (1964), 54 Ill.App.2d 27, 36-37. See also *People v. DeRosa* (1941), 378 Ill. 557, 563.) In order to justify an instruction submitting the issue of involuntary manslaughter to the jury on defendant's theory there must be some evidence in the record which shows that defendant recklessly performed such acts causing death as were likely to cause death or great bodily harm. Ill. Rev. Stat. 1969, ch. 38, par. 9—3(a); *People v. Sanders* (1974), 56 Ill.2d 241, 253.

The defendant's court room testimony does not advance his theory since it is essentially a lack of recall. His testimony that he remembered saying that the others should not go for a gun, that he pulled out his gun, turned around "and it went off," is consistent with the testimony of the State's witnesses and does not advance a theory of reckless performance of acts causing death.

If any support is to be found for the defense it must be sought in the pretrial statement of the defendant. The statement however is fragmentary and somewhat ambiguous. The references to defendant's thinking that "the guy was going to get a gun," and that he told the group "not to go for any gun" merely suggest self-defense, which is neither urged nor based upon any evidence and indicates an intentional use of force which would be inconsistent with the defense of involuntary manslaughter. (See *People v. DeRosa* (1941), 378 Ill. 557, 563; *People v. Ruel* (1970), 120 Ill.App.2d 374, 378.) The only possible statement of defendant which could bear on the defense of involuntary manslaughter is that the gun had a "hair trigger" and while he had his finger on the trigger, "it went off, I didn't even have my left hand on the gun."

There is no statement by defendant at any time that he did not deliberately and intentionally discharge the shotgun. There is no evidence

in the record that the "hair trigger" referenced by defendant was other than a "standard crisp light trigger," as the gunsmith witness testified. There is no evidence that defendant was unfamiliar with the action of the gun or that in fact the action of the gun had anything to do with the homicide. The defendant had held the deceased and his friends at bay with the shotgun for several minutes commenting on the ease with which he could kill them all, and after turning away momentarily, turned back and simultaneously the gun went off while defendant was saying to the victim, "I am going to jail * * * I don't like you anyway." Under any view which may be taken of the record we conclude that there is no evidence which, even if believed by the jury, would have been sufficient to show that defendant recklessly performed the acts causing the death.

■■ The court did not err therefore in refusing an instruction defining involuntary manslaughter.

*People v. Guthrie* (1970), 123 Ill.App.2d 407, cited by defendant is inapposite. *Guthrie* is a typical example of the rule that the jury must be permitted to decide which of several possible offenses the defendant has committed depending on the jury's view of the evidence. (See also *People v. Joyner* (1972), 50 Ill.2d 302; *People v. Bembroy* (1972), 4 Ill.App.3d 522.) These decisions rely, of course, on the conclusion of the reviewing court that there was some evidence in the record which, if believed by the jury, could have justified conviction of the lesser offense. Some incongruities arise, however, with regard to the application of this particular standard. Generally, when there has been a conviction of murder, the courts are less inclined to determine on review that some evidence exists which would support conviction of the lesser included offense. See, *e.g.*, *People v. Cannon* (1971), 49 Ill.2d 162; *People v. Gonzales* (1968), 40 Ill.2d 233; *People v. Latimer* (1966), 35 Ill.2d 178; *People v. Mitchell* (1973), 12 Ill.App.3d 960; *People v. Wheeler* (1965), 57 Ill.App.2d 452; *People v. Johnson* (1964), 54 Ill.App.2d 27.

On the other hand, in cases where defendant has been convicted of involuntary manslaughter although charged with murder in somewhat similar circumstances to those before us, the courts are inclined to find sufficient evidence to support the conviction of the lesser offense despite the argument that the evidence proves only voluntary manslaughter or murder instead. See *People v. Barksdale* (1970), 131 Ill.App.2d 103; *People v. Reece* (1970), 123 Ill.App.2d 97; *cf. People v. Vega* (1974), 16 Ill.App.3d 504.

■■■ In our view the most satisfactory trial solution would be for the judge to liberally apply the rules respecting the giving of instructions

on lesser included offenses when requested by a defendant so as to give them freely in cases where there is any evidence fairly tending to bear upon the issue of that offense even though the evidence may be weak, insufficient, inconsistent or of doubtful credibility. (See *United States v. Sinclair* (D.C. Cir. 1971), 444 F.2d 888, 889; *United States v. Belton* (D.C. Cir. 1967), 382 F.2d 150, 155; see also *People v. Taylor* (1967), 36 Ill.2d 483, 490-491.) Even in cases in which there is no direct testimony that could establish a lesser included offense but where the jury could fairly infer that the lesser offense had been committed the defendant should be given the benefit of the doubt and the instruction as to the lesser included offense should be given in respect for the jury's central role in our jurisprudence. See *United States v. Huff* (D.C. Cir. 1971), 442 F.2d 885, 890; *United States v. Belton* (D.C. Cir. 1967), 382 F.2d 150, 155; *cf. United States v. Whitaker* (D.C. Cir. 1971), 447 F.2d 314, 321.

■■ Despite our conclusions regarding the degree of liberality which we believe should be exercised in the giving of instructions on lesser included offenses, we are unable to find error in the refusal of the instruction on the particular circumstances of the case before us.

For the reasons stated we affirm the judgment of conviction.

Affirmed.

T. MORAN and RECHENMACHER, JJ., concur.