THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOSEPH BRECHON, Defendant-Appellant.

Third District   No. 78-210

Opinion filed May 24, 1979.

Robert Agostinelli and G. Joseph Weller, both of State Appellate Defender's Office, of Ottawa, for appellant.

C. J. Hollerich, State's Attorney, of Princeton (John X. Breslin, Joseph A. Mueller, and Rita F. Kennedy, all of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE BARRY delivered the opinion of the court:

The defendant, Joseph Brechon, was convicted of involuntary manslaughter following a jury trial in the Circuit Court of Bureau County. He was sentenced to a term of imprisonment of from one to three years. On appeal defendant has presented two issues, namely, whether he was improperly found guilty of involuntary manslaughter where the State's evidence as to the cause of death was allegedly insufficient to prove the corpus delicti of the crime beyond a reasonable doubt, and whether there was sufficient evidence, apart from the defendant's extrajudicial admissions, to prove that the victim's death resulted from a criminal act of the defendant.

Joseph Brechon was accused of involuntary manslaughter in connection with the death of his seven-year-old son, Louis. The charge of involuntary manslaughter resulted from statements the defendant made to a polygraph examiner and repeated in the presence of a State trooper and the Bureau County sheriff. The defense unsuccessfully sought to suppress defendant's statements but their admission into evidence was not raised in this appeal. The record contained the defendant's transcribed statement in People's exhibit "1(C)" where the defendant allegedly stated in part:

"[I] got home that afternoon around four, and I laid down until around seven, seven thirty. Then I got up and ate supper. And I told my wife I was going to go out and feed the dog while Louis took his bath. And I had done that and I was in the garage at the time and I found a can of S.T.P. had been into. And it kind of made me mad, so I went in to talk to him about it. And I went in there [bathroom] and I had asked him about it. I had slapped him on the left side of the face and then grabbed his right arm and pulled and twisted it, cracked his knuckles, at which time, he was laying in the water, his head partly under water. And I had yelled for my wife to call the Emergency Squad. And she couldn't remember the number so she called the neighbor and they called the Emergency Unit down. I imagine they was there about an hour and they took him from there to the Princeton Hospital."

Louis died despite vigorous attempts to revive him. When the rescue squad arrived Louis was not in the bathtub where the incident with the

defendant occurred, but was found clad in his pajama bottoms and completely dry, lying on the living room floor. At the trial the defendant's claim was that insufficient evidence existed to link his actions to Louis' death because of the uncertainty of the opinions of the various expert medical and pathological witnesses called by the parties as to the cause of death. The difficulty in determining cause of death was occasioned by Louis' body being partially embalmed before the autopsy was performed. The embalming that was accomplished before the autopsy consisted of arterial processing or the exchange of the blood in the body with embalming fluid. The State's pathologist testified that the most reliable pathological test for drowning, the chloride test, was worthless because of the embalming through arterial processing.

The embalming process through the arteries of the victim apparently prevents the test for chlorides in the blood from being conducted with any success. The State's pathological expert, Dr. Lymberpoulos, stated, "This is a very difficult case to determine with certainty, on solid objective anatomic and chemical findings the dominant role of drowning." It appears the medical basis for a finding of drowning as the cause of death was the presence of "pink frothy fluid" in the boy's lungs, trachae, and bronchi. Dr. Lymberpoulous' admitted the pink frothy fluid was similar in color to embalming fluid. The defense pathologist and the victim's treating physician explained that the resuscitation efforts on Louis Brechon could have produced the frothy fluid in his lungs by either aspiration, a forcing of fluid up from the stomach, or by damaging the capillaries in the lungs, allowing the embalming fluid to seep into the lungs. X rays of the victim's lungs shortly after he was pronounced dead revealed the presence of fluid in the lungs at that time. The defense also interjected through testimony the very remote possibility that the decedent's death may have been caused by an overdose of a drug he was taking.

■■ The corpus delicti in a criminal homicide consists of the fact of death caused by the criminal agency of another. (*People v. Wilbourn* (1978), 56 Ill. App. 3d 1022, 372 N.E.2d 874.) Defendant contends that the facts of this case do not establish beyond a reasonable doubt that his acts caused the death of his son. Specifically he claims there was only a showing that Louis Brechon may have died of drowning. The defendant disputes his admitted slapping of the boy, twisting his arm, and causing his face to be submersed in the water as the direct cause of death. His argument is premised upon a finding of insufficient evidence to prove that the cause of death was drowning. Defendant relies upon the case of *People v. Benson* (1960), 19 Ill. 2d 50, 166 N.E.2d 80, for support of his argument that his acts were not proved beyond a reasonable doubt to be the cause of his son's death. We believe the *Benson* case is distinguishable. There the pathologist testified that the medical cause of death was from other causes

and not from the defendant's rape or act of sexual intercourse. In the present appeal there is no satisfactory evidence of any other cause of death than drowning precipitated by defendant's acts of violence to his son.

The various medical evidence pointed to Louis drowning as one alternative, and as the probable cause of death. The defendant's own admissions certainly corroborate the medical hypothesis of drowning as the cause of Louis Brechon's death. Post-mortem X rays before embalming showed the presence of fluid in his lungs. The defendant admitted striking his son, and said the boy did not cry out or resist. He also admitted twisting the boy's arm which forced his face under water for 30 seconds, approximately, while admitting it could have been a longer time.

■■ The same theory of defense was used in *People v. Love* (1978), 71 Ill. 2d 74, 373 N.E.2d 1312, where the victim was severely beaten by the defendant and ultimately died after being hospitalized. The conviction there was upheld with the court holding that the only reasonable inference that could be drawn from the evidence was that defendant's conduct caused the injury received by the victim and caused the death. The same inference was reasonable and was properly drawn by the jury in the case at bar. Although the defendant argues that there is a reasonable hypothesis of his innocence, the jury should not disregard the inferences from the evidence and are not required to search out explanations compatible with innocence or to elevate those explanations to the status of reasonable doubt. (*People v. Holland* (1973), 11 Ill. App. 3d 591, 297 N.E.2d 310.) When the medical evidence is added to the admitted beating of the victim in the bathtub by the defendant in context to the immediate chronological events leading up to the boy's death, we believe the evidence more than sufficient to support the jury verdict of guilt.

■ As a secondary argument the defendant asserts that more than his bare admissions are necessary to prove that a criminal agency caused Louis Brechon's death in order to convict him of involuntary manslaughter. He relies upon the cases of *People v. Lueder* (1954), 3 Ill. 2d 487, 121 N.E.2d 743, and *People v. Hougas* (1968), 91 Ill. App. 2d 246, 234 N.E.2d 63. Both cases involved arson convictions where the only proof of the crime was the accused's confession in each case and the fact that fire burned a building. The courts in both cases ruled that there was insufficient corroboration of each confession because there was no independent evidence that the fires resulted from criminal acts. It is true that some evidence tending to inspire belief in the truth of the confession or admission needs to be present to support a conviction. However, it is not required that the corpus delicti be proved by evidence *aliunde* the confession or admission of the accused. (*People v. Miller* (1958), 13 Ill. 2d

84, 148 N.E.2d 455.) Independent evidence does not have to corroborate the proof as to any particular element of the crime charged but only establish a tendency to inspire belief in the truth of the accused's confession or admission. Here the overall factual situation leading up to the death tends to inspire truth in Joseph Brechon's admission. There was only a short time between the beating and the calling of the rescue squad. Defendant admitted being "really mad" at his son and not knowing how hard he struck him. Defendant readily admitted twisting the child's arm, cracking his knuckles, and thereby forcing his face under water for 30 seconds or maybe even longer. Only when defendant realized this did he pull him from the bathtub and begin resuscitation attempts. These detailed facts supplement and corroborate the medical evidence and theory that the cause of death was drowning. The jury could properly draw reasonable inferences from all the evidence, including defendant's admissions to the police. There was sufficient medical evidence *aliunde* the admission to prove that it was defendant's criminal agency which caused his son's death. The defendant was properly convicted of involuntary manslaughter and the judgment of the Circuit Court of Bureau County is affirmed.

Judgment affirmed.

STOUDER, P. J., and ALLOY, J., concur.