THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES H. WARD, Defendant-Appellant.

Fifth District   No. 81—563

Opinion filed February 9, 1983.

WELCH, J., specially concurring.

Daniel D. Yuhas and Diana N. Cherry, both of State Appellate Defender's Office, of Springfield, for appellant.

John Baricevic, State's Attorney, of Belleville (Stephen E. Norris and Robert C. Cook, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE KARNS delivered the opinion of the court:

Defendant, James Ward, was convicted of murder of a four-year-old boy after a jury trial in the circuit of St. Clair County and sentenced to 25 years' imprisonment. He appeals, contending that the trial court improperly refused his tendered instructions on involuntary manslaughter and improperly excluded evidence of prior child abuse on the part of the deceased's mother, Harriet Young, who had previously been convicted of the murder of the child. He also assigns as error certain prejudicial argument of the prosecution, to which his objection was overruled, that stated to the jury, in essence, that the basis of the conviction of the child's mother was a determination by that jury that the mother was accountable for the acts of defendant, which in fact caused the child's death.

Montez Moore lived with his mother, Harriet Young, and a younger brother in East St. Louis. Defendant was a boyfriend of Young, staying at her home periodically. Defendant visited Young Monday, February 16, and Tuesday, February 17, the week of Montez' death.

Montez appeared to be in good health both days. At 2:30 or 3 a.m. on Thursday morning, defendant came to Young's home. When he arrived, Young told him Montez had urinated in bed and had put cocoa in the dog's pail. Defendant asked if she had whipped him and Young replied that she had. Defendant did not punish Montez although Young asked him to do so. Defendant stayed and slept at the house, awakening around 11 a.m. Thursday morning. Young then left the house to go to the store but soon returned.

The circumstances surrounding the fatal beating are disputed. Young testified that when Montez awoke she whipped him with a mop handle for urinating in bed. She did not "beat him." She testified that she saw defendant then beat Montez twice; around 12 p.m. defendant hit Montez severely on his chest, stomach and back with the mop handle. The beating was punishment for urinating in bed. An hour later defendant beat Montez again, this time for no apparent reason. Defendant and Montez were sitting on Montez' bed when defendant hit the child on the chest and stomach with the mop handle. Defendant testified that he did not touch Montez. He stated that after Young went to the store, he went back to sleep and slept until he left the house at 4 p.m.

Mary Owens, sister of defendant, arrived at Young's home at the same time defendant was leaving. She talked with Young and then laid down to rest. She was awakened by her son who told her Montez would not wake up. Young had left the room while Owens slept and was with Montez attempting to awaken him. Owens recalled that the child felt like ice. An ambulance was called.

Montez was pronounced dead on arrival at the hospital at 8:20 p.m., February 19. The examination revealed that his body was covered with multiple linear bruises that could have been caused by beating with a mop handle. His face, arms and buttocks were swollen and discolored. He appeared to be malnourished. The cause of death was respiratory arrest from a cerebral edema and injuries to the lungs accompanied by aspiration of milk into the airway. The fatal injuries were inflicted by beating the child with a blunt instrument. The pathologist was of the opinion that the bruises were administered in a single beating.

Young went to the hospital and was questioned there about the boy's injuries. She acknowledged at trial that she gave hospital personnel four or five different explanations for the injuries to cover for herself and for defendant and because defendant told her to tell a story. Young was subsequently convicted of murder in a separate trial.

Defendant turned himself in when he heard of Young's arrest. Of-

ficer Moore of the East St. Louis Police Department testified his investigation revealed that both Young and defendant were involved in the beating. A broken mop handle, a window shade roller and a shoe were taken from Young's home as possible weapons.

While in custody, defendant asked to see Viola Moore, grandmother of the child. Moore came to the station and talked with defendant. Officer Moore testified that he overheard parts of the conversation and heard defendant say that he didn't mean to do it; he had beaten Montez for putting some cocoa in the dog's water. When he heard Viola Moore ask why they didn't get medical help for the boy, Detective Moore stopped the conversation and asked Viola Moore to leave. Ms. Moore testified to the same conversation, adding that defendant said he started beating Montez with a shoe, then became angry and used a stick.

Defendant acknowledged that Moore came to the station but denied both asking for her and talking to her.

There was testimony that both Young and defendant had beaten the children previously. Three witnesses, two sisters of defendant, testified that defendant babysat for their children and that he never harmed them. Testimony also revealed that Young's oldest child was taken from her by the Illinois Department of Children and Family Services. Details of the reason for this action were excluded by the trial court.

Defendant's principal assignment of error is the refusal of the court to give his tendered instruction on involuntary manslaughter. At the instruction conference, the court noted that defendant had testified that he did not beat the child and reasoned that if he had admitted that he had beaten Montez, then the determination of whether his acts were performed recklessly or with the requisite mental state to constitute murder would be for the jury to determine, but inasmuch as he had denied the beating, the issue for the jury to decide was whether he was not guilty or guilty of murder.

■ However, it is well settled that if there is any evidence, regardless of its source, which tends to prove that defendant is guilty of the lesser-included crime of involuntary manslaughter, he is entitled to have the jury instructed on the lesser crime even though he has denied that he performed the act in question or defended on the basis of accidental homicide. *People v. Scalisi* (1926), 324 Ill. 131, 154 N.E. 715; *People v. Farmer* (1977), 50 Ill. App. 3d 111, 365 N.E.2d 177; *People v. Dortch* (1974), 20 Ill. App. 2d 911, 314 N.E.2d 324; and *People v. Bembroy* (1972), 4 Ill. App. 3d 522, 281 N.E.2d 389.

Murder is defined as the intentional killing of another without

lawful justification or the killing of another intending to do great bodily harm or knowing that the acts performed will cause death or create a strong probability of death or great bodily harm (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)). Involuntary manslaughter is the unintentional killing of another where the "*** acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm ***" and are performed recklessly. Ill. Rev. Stat. 1981, ch. 38, par. 9—3(a).

A person intends a result "*** when his conscious objective or purpose is to accomplish that result ***." (Ill. Rev. Stat. 1981, ch. 38, par. 4—4.) A person acts with knowledge of "[t]he result of his conduct *** when he is consciously aware that such result is practically certain to be caused by his conduct." Ill. Rev. Stat. 1981, ch. 38, par. 4—5(b).

Recklessness is defined in the Criminal Code of 1961 as follows:

"A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. ***." Ill. Rev. Stat. 1981, ch. 38, par. 4—6.

Thus it can be seen that the element distinguishing murder from involuntary manslaughter is the mental state of the accused. Murder requires the presence of an intent to kill or knowledge that death or great bodily harm will result from the conduct of the defendant. Involuntary manslaughter is committed when the actor consciously disregards a substantial and unjustifiable risk that his acts are such as are likely to cause death or great bodily harm.

We believe this case is unlike *People v. Dunnigan* (1980), 89 Ill. App. 3d 763, 412 N.E.2d 37, and *People v. Robertson* (1976), 43 Ill. App. 3d 143, 356 N.E.2d 1180, relied upon by the trial court, where the reviewing court found that the presence of multiple stab wounds inflicted with a knife, a lethal weapon, negated any possibility that the defendant acted recklessly rather than with intent to kill. Further, in *Dunnigan* the jury was instructed on the lesser crime of involuntary manslaughter. The court noted that it was for the jury to determine if the defendant was guilty of murder or manslaughter.

Here it is not clear whether the fatal injuries were administered with hands or fists, or a shoe or stick, or a combination of both. Unfortunately, this pattern of child abuse resulting in death is not uncommon in the reported cases. The common holding of these cases is

that it is for the jury to decide whether the defendant was guilty of murder or involuntary manslaughter or whether the death resulted from accidental homicide.

In *People v. Gresham* (1979), 78 Ill. App. 3d 1003, 398 N.E.2d 398, defendant's three- or four-year-old daughter died from brain swelling, caused by trauma. Defendant, the deceased's father, in an oral and written statement stated that he had punished the child for drinking from the toilet bowl by striking her with a belt, an extension cord and by "bumping her head on the wall." At trial, while admitting he made these statements, defendant testified that he did not push the child's head against the wall, rather he pushed her to prevent her from slipping in a puddle of water on the floor, that she fell injuring herself and that his conduct was at most reckless. The trial court refused defendant's tendered instructions on involuntary manslaughter, believing that under the evidence, the defendant was either guilty of murder, or, according to his testimony at trial, not guilty as the death was the result of accident.

Noting that the basic difference between involuntary manslaughter and murder is the mental state accompanying the conduct causing death, the court held that the refusal of allowing the jury to make this determination was error. The court stated:

> "When the death results from the use of nonlethal weapons, such as fists, a somewhat different situation exists. Whereas the intentional use of a deadly weapon is accompanied by a presumption the actor knows his acts create a strong probability of death or great bodily harm because a person intends the natural and probable consequences of his acts, generally, no similar presumption accompanies the striking of an individual with fists, since death is not a reasonable or probable consequence of a blow with a bare fist. (*People v. Crenshaw* (1921), 298 Ill. 412, 131 N.E. 576.) \*\*\* Hence, differences between murder and manslaughter involve considerations of degree. *People v. Davis* (1966), 35 Ill. 2d 55, 219 N.E.2d 468.
>
> Such considerations are particularly significant when the evidence is conflicting or is susceptible of more than one inference and non-lethal instrumentalities caused death. When the evidence is conflicting and more than one inference may be reasonably drawn from it, it is the province of the jury to decide whether the accused is guilty of manslaughter or murder if there is any evidence which tends to prove the lesser crime." 78 Ill. App. 3d 1003, 1007, 398 N.E.2d 398, 401-02.

We have been unable to find a death from child abuse case where

instructions on involuntary manslaughter have been refused. It would appear that the mental state accompanying the acts causing death in these tragic cases has always been considered a question for the jury's determination. Thus, in *People v. Ryan* (1956), 9 Ill. 2d 467, 138 N.E.2d 516, defendant was indicted for murder and involuntary manslaughter for suffocating her newborn baby by placing it in a small, overnight case. Defendant's conviction for involuntary manslaughter was sustained on appeal, the court noting that it was for the jury to determine whether defendant was guilty of murder or involuntary manslaughter. In a case factually similar, *People v. Bartell* (1944), 386 Ill. 483, 54 N.E.2d 700, defendant was indicted for murder and convicted of voluntary manslaughter for causing the death of his minor child by beating her so severely that she died of brain injuries resulting from a fracture of the skull. In both of these cases it would appear that it was tacitly conceded that in these unfortunate circumstances the jury must decide the degree of the defendant's offense.

More recently, in *People v. Brechon* (1979), 72 Ill. App. 3d 178, 390 N.E.2d 626, the court sustained defendant's conviction for involuntary manslaughter for causing the death of his seven-year-old son. As in this case, the defendant became angry because of something the boy did; he went into the bathroom where the boy was bathing, struck him in the face and either pushed or caused his head to go under the water, resulting in his death by drowning.

Here, the injuries inflicted on the child were severe. The medical testimony established that considerable force was used in the beating because bruises were found in the chest muscles and on the lungs, both protected by the chest cavity, and on the brain, protected by the skull. The chest had been struck so hard that it was compressed, forcing the lungs up against the child's spine. The emergency room physician testified that the bruises were so dark they appeared to be burns. Neither the physician nor the pathologist could accurately estimate the number of bruises inflicted. In this case, the severity of the beating and the evidence that it was administered in part with a mop handle would clearly support the jury's determination that defendant was guilty of murder, had the jury been properly instructed and the trial free from serious prejudicial error, which we will address later.

We emphasize that the evidence was sufficient to support defendant's conviction for murder even though a nonlethal weapon may have been used. (*People v. Palmer* (1979), 76 Ill. App. 3d 1014, 395 N.E.2d 713.) Even a blow with the first may constitute murder where there is great disparity in size and strength between the defendant and his victim and the jury is properly instructed. *People v. Crenshaw* (1921),

298 Ill. 412, 131 N.E. 576; *People v. Drumheller* (1973), 15 Ill. App. 3d 418, 304 N.E.2d 455.

As the court stated in *People v. Crews* (1969), 42 Ill. 2d 60, 244 N.E.2d 593, society is outraged at the killing of a young child; but care must be taken that the accused receives a fair trial where the jury is properly instructed. We believe that there is some evidence in the record which, if believed by the jury, would justify a conviction of the lesser offense of involuntary manslaughter. As the court noted in *People v. Boisvert* (1975), 27 Ill. App. 3d 35, 42-43, 325 N.E.2d 644, 650:

> "[T]he most satisfactory trial solution would be for the judge to liberally apply the rules respecting the giving of instructions on lesser included offenses when requested by a defendant so as to give them freely in cases where there is any evidence fairly tending to bear upon the issue of that offense even though the evidence may be weak, insufficient inconsistent or of doubtful credibility. [Citations.] Even in cases in which there is no direct testimony that could establish a lesser included offense but where the jury could fairly infer that the lesser offense had been committed the defendant should be given the benefit of the doubt and the instruction as to the lesser included offense should be given in respect for the jury's central role in our jurisprudence."

As this case must be remanded for retrial, we shall address defendant's other contentions of error. Over the objection of defendant, the prosecution made the following argument to the jury:

> "And when Harriet Young came before you, she in fact was convicted at that moment for the murder of her own little boy. Not so much upon the premises of what she did, but what she failed to do when she had a duty to do something about it. Stand by and allow something like that to happen."

Harriet Young had been convicted of murder; the effect of the prosecution's argument was to tell the jury, as a matter of fact, that she had been convicted on principles of accountability, not for acts which she performed, but for aiding and abetting defendant in what he did in bringing about the child's death. There was no evidence, as indeed there could have been none, of the facts in Young's trial or the basis on which the jury returned its general verdict finding Young guilty of murder. Arguments not based on the evidence are improper. (*People v. Dukes* (1957), 12 Ill. 2d 334, 146 N.E.2d 14.) The critical issue in the trial was who was responsible for the child's death. The defense was that Harriet Young performed the acts; she testified she

did not. The jury had to determine the credibility of Young and defendant. The prosecution's improper argument told the jury that a prior jury had determined as a fact that Young had not herself done anything that caused the death of Montez. This was improper and highly prejudicial; the court overruled defendant's objection to this argument, thus expressing its approval of the propriety of this argument.

The State attempts to justify the comments as one on her credibility. But this misses the mark. Admittedly she, too, had been convicted of the murder of Montez, but this comment went far beyond an attempt to bolster her credibility as the factual assertion of the basis of her conviction has no bearing on the question of her motivation to lie or tell the truth.

Defendant's final claim of error involves exclusion of evidence of prior abuse by Harriet Young and exclusion of expert testimony by a supervisor from the Department of Children and Family Services concerning patterns of child abuse.

■ While evidence of the commission of other crimes or wrongs by an accused is not generally admissible as the basis for an inference that he committed the crime in question, evidence of prior crimes or wrongs is admissible to show absence of accident, motive, opportunity, intent, identity, plan or scheme. (*People v. Booker* (1966), 34 Ill. 2d 16, 213 N.E.2d 542, *cert. denied* (1967), 386 U.S. 929, 17 L. Ed. 2d 800, 87 S. Ct. 872; 1 S. Gard, Illinois Evidence Manual 165-66 (2d ed. 1979).) Courts have, under the exceptions, admitted evidence that an accused has abused children in the past. *United States v. Colvin* (5th Cir. 1980), 614 F.2d 44 (motive, pattern of abuse); *People v. Platter* (1980), 89 Ill. App. 3d 803, 412 N.E.2d 181 (mental state); *People v. Drumheller* (1973), 15 Ill. App. 3d 418, 304 N.E.2d 455 (absence of accident, mental state).

Here, defendant was attempting to make use of the exceptions against his principal accuser. He argues that the prior beatings by Harriet Young tend to show a pattern of conduct on her part and consequently that she, not defendant, administered the fatal beating. The exceptions to the exclusionary rule are not limited to evidence offered by the prosecution against an accused. (*Johnson v. Brewer* (8th Cir. 1975), 521 F.2d 556; S. Saltzburg & K. Redden, Federal Rules of Evidence Manual 126 (3d ed. 1982).) The defendant may offer evidence that a State witness has committed prior crimes or wrongs if the purpose is within the established exceptions. While the admission of such evidence is a decision requiring the exercise of discretion on the part of the trial court, and involves a balancing of competing interests, we

believe it was error to exclude the proffered evidence in this case. McCormick, Evidence sec. 190, at 453 (2d ed. 1972).

Some evidence of Young's prior conduct was admitted into evidence. One incident of prior abuse was related to the jury. Pat Lynn, a nurse social worker with the Department of Children and Family Services, testified that Young's oldest boy was removed from her home after he had been abused. Young admitted to the Department that "she had whipped the child with a belt, then she whipped him with a cord from a T.V. antenna." Young testified to the same incident. Although she denied that she beat the boy, she confirmed that the Department removed the boy from her home and placed him with Viola Moore.

In addition, the jury was informed that defendant's sisters, Mary Owens and Havana Owens, witnessed a prior beating. Mary Owens was asked if she saw Young discipline her children. Owens replied, "I done seen her discipline them a lots, only one time did I, that I really seen her whoop him, you know, and got upset." However, she and her sister were precluded from testifying to the details of these beatings. We believe the exclusion of this evidence was error.

The State argues that Harriet Young's past behavior toward Montez had no bearing on what James Ward may have done. We disagree. The question the jury had to decide was whether the acts of Young or defendant, or both, caused the death of Montez. Defendant denied he administered the fatal beating. He was entitled to attempt to prove that it was more likely that Young performed the acts which caused the child's death. We think defendant was entitled to introduce evidence of her past conduct toward Montez. The rule prohibiting evidence of independent criminal acts of an accused has no application here as Young was not on trial. A defendant is always entitled to attempt to prove that someone else committed the crime in question.

While Young had been convicted of murder in the death of the child, she denied she performed the acts which caused Montez' death. She laid the blame in her testimony to defendant; her credibility was obviously relevant to defendant's defense.

Nor do we believe that the prior conduct was too remote in time. In this regard, we believe the court in its discretion could have admitted expert testimony concerning the "battered child syndrome," if it was satisfied that the proffered witness was qualified to give an opinion on the subject. In *People v. Platter* (1980), 89 Ill. App. 3d 803, 412 N.E.2d 181, the court not only approved the admission of evidence of prior acts of child abuse by defendant as falling within the often stated exceptions to the nonadmissibility of evidence of other

crimes, but also considered that expert testimony concerning the "battered child syndrome" was admissible against the accused. If material and competent against a defendant, it would be admissible against a witness, who was the principal accuser of the defendant, who had been convicted of the child's murder and who had admitted that she had "whipped" the child in the past. Contrary to the State's assertion, we believe that logic dictates that the prior actions of the mother are probative of defendant's guilt or innocence.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is reversed and this cause is remanded for trial in accordance with the views expressed herein.

Reversed and remanded.

JONES, J., concurs.

JUSTICE WELCH, specially concurring:

While I concur in the result reached by the majority, I cannot agree that the trial court erred in refusing defendant's tendered involuntary manslaughter instructions. The trial court reasoned that the defendant was not entitled to the instructions because, at trial, he had denied striking Montez Moore. However, I believe that the court's decision was correct for a different reason.

It has been held that a beating resulting in death can be so severe as to negate any possibility that it was performed recklessly, especially where the victim was struck repeatedly with something other than the fists of the assailant. (*People v. Brown* (1967), 89 Ill. App. 2d 231, 231 N.E.2d 263; *People v. Causey* (1978), 66 Ill. App. 3d 12, 383 N.E.2d 234.) In such cases, involuntary manslaughter instructions need not be given. The brutal beating of Montez Moore, accomplished in large part with a rod or stick and producing internal and external bruises too numerous for the examining physician to count, must certainly fall into this category.

But, instead of recognizing this rule and applying it in this case, the majority, in effect, holds that there is a "child abuse" exception to the rule. This exception is, in my view, neither required by the case law nor justified by logic. Those authorities cited by the majority as examples of facts supporting involuntary manslaughter convictions for the death of a child do not involve attacks as extensive and vicious as that made on Montez Moore. These cases, in which a single act of child abuse (*People v. Ryan* (1953), 9 Ill. 2d 467, 138 N.E.2d 516 (suffocation); *People v. Brechon* (1979), 72 Ill. App. 3d 178, 390 N.E.2d

626 (drowning)) or a series of blows administered with fists (*People v. Bartell* (1944), 386 Ill. 483, 54 N.E.2d 700; *People v. Platter* (1980), 89 Ill. App. 3d 803, 412 N.E.2d 181; *People v. Gresham* (1979), 78 Ill. App. 3d 1003, 398 N.E.2d 398 (death caused by single blow to head); *People v. York* (1978), 57 Ill. App. 3d 243, 373 N.E.2d 90 (defendant repeatedly shoved victim)) led to the death of the child, merely show that a homicide resulting from child abuse *can* be involuntary manslaughter (*People v. Gresham* (1979), 78 Ill. App. 3d 1003, 1009, 398 N.E.2d 398, 403). They do not dictate that a jury question is always presented concerning the recklessness of acts of child abuse which result in death, especially where a bludgeon is used to deliver literally countless blows.

Moreover, to allow an excessively savage beating of a child to be considered "reckless" when such a beating made on an adult would be intentional as a matter of law defies common sense. The use of an object such as a mop handle on an infant or small child is far more likely to cause death, and thus be an intentional act, than would the use of the same force upon an adult. For these reasons, I believe that the beating death of any victim, including a child, which is so extensive as to negate any possibility it was inflicted recklessly, is insufficient evidence to support an involuntary manslaughter instruction. Because the death of Montez Moore undoubtedly is of that sort, I disagree with that portion of the majority's opinion which holds that that instruction is required in this case.