THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ARTURO NINO, Defendant-Appellant.

Third District   No. 3—84—0751

Opinion filed June 25, 1985.

Irwin L. Frazin and Robert Fisher, both of Frazin & Fisher, of Chicago, for appellant.

Edward F. Petak, State's Attorney, of Joliet (John X. Breslin and Gary F. Gnidovec, of State's Attorneys Appellate Service Commission, of counsel), for the People.

PRESIDING JUSTICE HEIPLE delivered the opinion of the court:

Defendant was convicted of murder and sentenced to 22 years' imprisonment. We affirm.

During the summer of 1983, the east side of Joliet was a dangerous place to live. Gang violence among the young Mexican-Americans in the neighborhood was prevalent. Gunplay was apparently not an unusual method of fighting intergang battles. It is out of this background that the facts of the instant case arose.

Alfonso Paramo was driving his brother's gray Camaro on the evening of July 12. His passengers were Ricky Villanuava and Ruben Mauricio. The passengers were both armed. As they headed east on Ohio, a young Mexican appeared. He either made gang signals at them, shouted "King love," or both. These were meant to identify the signaller as a member of the Latin Kings. The Camaro occupants were all at one time or another affiliated with the Chicago Players, a rival gang of the Latin Kings. Antagonized by these communications, shots were fired by either Mauricio or Villanuava. The Camaro continued on to Youngs, turning east on Columbia, then headed south on Garnsey back towards Ohio.

At about 507 Garnsey, the Camaro went into reverse in response to a whistle. The whistle came from 511 Garnsey, where a party was in progress. The whistler was Ruben Moreno, Jr., the victim in this case. He spoke briefly with the men in the Camaro. He turned to walk away. As he faced away from the Camaro, a single shot rang out. The shot came from the corner of Ohio and Garnsey. Moreno appeared to jump in the air and fell to the ground face first. A resident of 511 Garnsey, Lisa Hernandez, was on the porch. She told Moreno to get up and quit joking around. The Camaro pulled away and drove south on Garnsey. It was only after looking underneath the towel around Moreno's neck that it was discovered that he had been shot in the back of the neck. Moreno died two weeks later of complications from the gunshot wound. Two .22 shell fragments were recovered in an autopsy.

Earlier that evening, Bennie Carreno, Andy Lopez and Pepe Salazar had been at the home of Sonya Alonzo at Jackson and Collins. They were sniffing paint, which induces a drowsy effect which lasts for about an hour. Armando Flores, Anthony "Catfish" Hernandez and defendant, Arturo Nino, Jr., showed up at Alonzo's back door. Defendant said that the Players were out and that they should go get them. The three had come from Pete Hendricks' house at 504 Ohio, where the first incident with the Camaro occurred. Hernandez had been the one who made signals and/or shouted "King love" at the Camaro as it passed him on Ohio. Defendant had even tried taking a shot at the Camaro with a .22, but the gun jammed. Upon unjamming it, defendant fired a shot into the air. It was then that the three went to Alonzo's to recruit Lopez, Carreno and Salazar.

The group from Alonzo's house joined defendant, Flores and Hernandez in running toward the intersection of Ohio and Garnsey. As the events leading up to the death of Moreno unfolded, various witnesses heard and saw different things. Thus, each individual story

must be set out to determine what actually happened that evening.

Ben Carreno left with Andy Lopez from the Alonzo house. He fell on the way and was behind the others. At the northwest corner of Ohio and Garnsey, he positioned himself behind a tree. Flores and defendant were there as well. Flores had a .22 rifle which actually belonged to Carreno. Flores kept it because Carreno could not keep it at his house. Flores, Carreno and defendant squatted down. Defendant took the gun from Flores and pointed it north along Garnsey for 7 to 10 seconds. Carreno backed off, turned around and heard a single shot from behind him. He ran, but hit the branch of an evergreen and fell. He crawled to the back of a driveway. He then saw defendant and Flores struggling over the gun. The gray Camaro then passed by on Garnsey, firing shots at them. Flores fired at the Camaro, and someone threw a bumper at the Camaro as it passed. Carreno then went back toward Hendricks' house on Ohio and met Andy Lopez. Defendant and Flores followed. Defendant said, "I got that m-----f-----. I seen his neck jerk." Carreno and Lopez ran to David Davilla's house to get a shotgun. They got into Davilla's car. They heard defendant and Flores. Defendant again said, "I got him. I got that m-----f-----." Davilla then drove Carreno back to Alonzo's.

Jim Gurnitz had been drinking beer at the party at 511 Garnsey. After the party broke up, he bought more beer and went to Hendricks' house. He told the story of how defendant's gun jammed when shooting at the Camaro. Before leaving, defendant said, "Let's go get some Players." Defendant, Flores and Hernandez left. He then left to take Corina Otte, a 14-year-old girl, back to her house. They were with two younger children whom Corina was babysitting. They arrived at the bridge before Ohio and Garnsey. He saw Hernandez in the southwest corner of the intersection and saw people resembling defendant and Flores in the northwest corner. Defendant was pointing a gun toward 511 Garnsey. He heard a shot, a pause, then a few more shots. The Camaro fled south and Hernandez threw the bumper at it. As defendant ran toward the bridge, Gurnitz heard defendant exclaim, "I got one. I seen him fall." He then went back to Hendricks' with Corina, Hendricks and the children. He later took Corina home. He did not recall seeing Bennie Carreno that night.

Larry Melville was at the party at 511 Garnsey. After a visit to another house, he went to Hendricks' house. Hernandez, Hendricks, Gurnitz, Corina, defendant and Flores were there. Flores had the gun, a .22 with the stock cut off. Defendant told him that the bumper they picked up was to throw in front of a car to stop it and that he was going to get some Players.

Andy Lopez testified that he left the Alonzo house intending to fight the Players with fists. After stopping at Hendricks', he headed down Ohio toward Garnsey. Instead of crossing the bridge, Lopez went into the yard before the bridge. A few minutes later he heard a shot, and then a volley of shots a few minutes later. Flores ran across the bridge, telling Lopez and Carreno to go to Davilla's to get a shotgun. Defendant then came over the bridge. Lopez heard him say, "I seen his neck jerk." He also heard defendant when he was at Davilla's saying, "I got that m-----f-----." Mr. and Mrs. Davilla, Sr., both testified hearing defendant say those words at their house.

Corina Otte testified for defendant that she was with Gurnitz at the bridge, but never heard defendant say any of the things testified to by Gurnitz.

There were other important witnesses who did not give occurrence testimony. Roberto Flores stated that when he was at Joliet Central High School he heard defendant say, "Man, I didn't mean to shoot the dude. The real m-----f----- I wanted to get was Ruben Mauricio." There was some evidence that Moreno and Mauricio were of a similar height and build. However, two of the people defendant was supposedly talking to at school denied ever hearing defendant make those remarks.

Adolpho Lechuga and Carreno both testified that defendant offered to sell them the gun in question some months before the shooting. Carreno bought it. All three took a turn trying to shoot out a street light. Lechuga and Carreno missed; defendant hit the light with one shot.

Officer Thomas Todd, the principal investigating officer, told of the various statements given by defendant. He first told Todd on July 20 that he was not anywhere near Ohio and Garnsey at 11 p.m. on July 12. On July 25, he told Todd he was with his girlfriend until 9 p.m. He then told of being at Hendricks' and being shot at by someone in the Camaro. He next related the recruitment at the Alonzo house. He ended up on the southwest corner of Ohio and Garnsey in the bushes. He saw Flores on the northwest corner. He stated that he threw the bumper at the Camaro.

Defendant chose not to testify at trial. Hernandez had moved away and was not called. Flores, who had been stationed in Germany with the United States Army, may or may not have been served with a State subpoena. He was arrested upon his return to Illinois and charged with murder by accountability. Defendant called him to testify with the knowledge that his attorney had advised him not to answer any questions.

■■ Defendant argues that he was not proved guilty beyond a reasonable doubt. Two major deficiencies in the State's case are cited. First, the State's key witnesses, Gurnitz and Carreno, were substantially impeached by prior inconsistent statements made to Joliet police officers and defendant's private investigator. Also, both Gurnitz and Carreno were admittedly not at their observational best. Gurnitz had been drinking and Carreno had been sniffing paint. Second, no witness actually testified to seeing defendant pull the trigger and seeing Moreno fall. Others in the area had guns. Flores had the gun, Mauricio and Villanuava had guns.

Defendant's arguments are unpersuasive. Whether or not a defendant is proved guilty beyond a reasonable doubt is not a matter where a court of review will lightly substitute its judgment for that of the trier of fact. This is especially true where the case depends on the credibility of witnesses. *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313.

There is little doubt that the testimony of Gurnitz and Carreno was substantially weakened by their prior inconsistent statements. But each testified that they were now telling the entire truth. The jury had every opportunity to disbelieve them. This obviously did not occur, since if one did not believe them, there would have been no evidence against defendant except his own admissions.

Beyond the problem of credibility, there is little in the record to suggest that defendant did not kill Moreno. Several witnesses placed defendant in a place to take the fatal shot. Defendant's own statements and the prior incident with the Camaro suggest a strong inclination on defendant's part to commit such an act. Gurnitz and Carreno both had defendant aiming the gun in the direction of Moreno and firing a single shot. Numerous witnesses around 511 Garnsey testified to hearing a single shot from the south and seeing Moreno fall.

Defendant's attempts to introduce reasonable doubt by raising the possibility of a different gunman was unavailing. No one testified to seeing Flores aiming the gun at the time the shot went off. Carreno's testimony that defendant grabbed the gun from Flores was uncontradicted. As to Mauricio and Villanuava, both were arrested for the murder but not charged. There would have been at least two eyewitnesses outside the Camaro if either of them had shot. Also, the testimony was that the shot came from south and not from directly in front of them.

Most significantly, defendant's own admissions provide unshakeable corroboration of the occurrence testimony. No less than seven individuals testified to hearing defendant unequivocally admit to shoot-

ing Moreno. Defendant's assertion that he was just idly boasting to impress his cohorts is contradicted by the consistency of the language and spirit of the admissions. Defendant was clearly proved guilty beyond a reasonable doubt.

Defendant next argues that the arrest of Armando Flores was illegal and was done for the purpose of keeping Flores from testifying on his behalf.

Section 4 of the Uniform Act to Secure the Attendance of Witnesses from Within or Without a State in Criminal Proceedings (Ill. Rev. Stat. 1981, ch. 38, par. 156—4) exempts from arrest a person coming into the State in obedience to a summons directing him to testify. Defendant argues that the arrest of Armando Flores contravenes this statute.

The State argues that defendant has no standing to challenge the arrest of Flores. It also argues that the statute is inapplicable because the record shows that Flores was never served with a subpoena.

We need not address these arguments. Assuming *arguendo* that the arrest was improper, it is difficult to see how the arrest prejudiced defendant. Flores was advised not to testify because he was charged with murder by accountability. It is doubtless the case that the charge and not the arrest motivated Flores' desire to remain silent. It is thus difficult to see how the arrest in any way prejudiced defendant.

■ Defendant's final argument is that the court erred in refusing to instruct the jury on the lesser offense of involuntary manslaughter. Defendant's theory is that no witness testified to seeing him actually aim and shoot at the victim. Thus, it might be inferred that defendant was merely firing recklessly toward 511 Garnsey with no intention of hitting anything or anybody.

In deciding whether to give instructions on lesser included offenses when requested by a defendant, if there is any evidence, regardless of its source, which tends to prove defendant guilty of the lesser crime, he is entitled to have the jury instructed on the lesser crime. (*People v. Ward* (1983), 112 Ill. App. 3d 547, 445 N.E.2d 883.) This rule should be liberally applied. *People v. Boisvert* (1975), 27 Ill. App. 3d 35, 325 N.E.2d 644.

A search of the record reveals that the court properly refused these instructions. There was no evidence tending to support recklessness. To the contrary, the facts suggest that defendant, a talented marksman, took aim at a person he intended to shoot and hit him squarely with one fatal shot. His statements before and after the shooting show both an unquestionable intention to cause great bodily

harm and unmitigated satisfaction with his success. As defendant did not testify, any inference of accident, mistake or recklessness would be a result of speculation. The giving of the instruction must be based on some evidence of record. None is found here.

Accordingly, we affirm the judgment of the circuit court of Will County.

Affirmed.

BARRY and STOUDER, JJ., concur.